Bernice N. GRANDPRE, Plaintiff and Appellant,

v.

NORTHWESTERN NATIONAL LIFE IN-SURANCE COMPANY, an Insurance Corporation, Defendant and Respondent.

No. 11875.

Supreme Court of South Dakota.

Dec. 30, 1977.

Terence A. O'Keefe of Siegel, Barnett, Schutz, O'Keefe, Ogborn & Jewett, Aberdeen, for plaintiff and appellant.

D. J. McClure of Gillette & McClure, Redfield, for defendant and respondent.

MORGAN, Justice (on reassignment).

The plaintiff appeals from a judgment for the defendant after a trial to the court in an action which she brought as beneficiary to recover upon a temporary contract of life insurance upon her husband's life. We affirm.

The case was submitted to the trial court on stipulated facts and therefore we review the same by our own reading of the stipulated facts without any presumption that the trial court saw or heard the witnesses. The facts as stipulated establish that on March 13, 1970, Elwood N. Caufield, an agent for defendant, and Glen Scott, a broker for defendant, went to the Stanley E. Grandpre (Grandpre) residence near Conde, South Dakota, and solicited an application for insurance. At that time, Grandpre (age 54) completed an application for a $10,000 life insurance policy; gave Caufield a check for $43.71, which represented the full initial premium for the policy applied for and executed a Master Account Plan Request and Agreement. In return, Grandpre received a premium deposit receipt and was advised by Caufield that a physical examination would be required to complete the application. Caufield made arrangements for a physical examination of Grandpre by Dr. Saxton, which took place at the Huron Clinic in Huron, South Dakota, on March 18. Defendant received Dr. Saxton's report on March 20. After examining the report, defendant's underwriting department requested more information from Dr. Lenz (also of the Huron Clinic) who had taken an electrocardiogram of Grandpre in 1968. The information from Dr. Lenz was received on April 3, 1970, and was sent on to one of defendant's staff physicians for review. The staff physician discovered minor irregularities and he recommended that a current electrocardiogram be obtained for examination by a heart specialist.

In the meantime, defendant ordered and received on April 2, 1970, a Retail Credit Report which stated that Grandpre was "presently hospitalized in St. John's Hospital in Huron, South Dakota, as he reportedly had a stroke on March 29, 1970, about 11 o'clock at night." He was rushed to the hospital and wasn't expected to survive as "known to local sources." The defendant immediately mailed a request for a medical history of Grandpre to St. John's Hospital.

Defendant received a medical report on Grandpre directly from St. John's Hospital on April 9, 1970. The report revealed prior hospitalizations in July 1967 and March 1968, for "GI hemorrhage, probably duodenal ulcer" and in October 1968, for "upper GI hemorrhage." Because of Grandpre's ulcer history, defendant determined that he was not insurable on a standard basis and Grandpre's application was declined on Friday, April 10, 1970. On April 13, defendant issued a draft for $43.71, which represented a return of the premium deposit. On April 14, defendant wrote to Caufield declining Stanley Grandpre's application, enclosing the draft. On April 15, Caufield telephoned defendant's underwriting department to communicate the fact that Stanley Grandpre had died on April 9, 1970. On May 5, 1970, Caufield attempted to deliver defendant's draft to plaintiff who refused to accept. On May 14, 1970, defendant mailed the draft to plaintiff, but plaintiff has not cashed it.

Appellant urges that the deposit receipt provided coverage from the date of the application (the completion of the medical exam as per No. 3) unless the coverage was actually rejected (notice sent and received) prior to the date of the decedent's death (assignments of error Nos. 2 and 3).

Both parties agree that the condition as set out in the deposit receipt was a condition subsequent and the trial court so held.

The issue we must decide is whether a contract of insurance arose immediately upon receipt by defendant of the premium and completion of the required medical examination of Grandpre, subject to the right of defendant to terminate the agreement by notification to the applicant during his lifetime if it concluded that Grandpre was not an insurable risk, as appellant contends, or whether the premium deposit receipt created a contract of insurance to become effective as of the date of application only

after the respondent insurance company determined Grandpre satisfied the condition of being an insurable risk, as a condition subsequent which if not satisfied would void retroactively all previous temporary coverage.

The determination of this issue turns on the interpretation of the language of the premium deposit receipt. It should be noted that due to the uniqueness and variation of each insurance company's conditional receipt or binder, the precedent evolved from this case may well be limited.

The conditional receipt is a sales device instituted by the life insurance industry whereby a life insurance company would warrant coverage upon payment of the initial life insurance premium at the time of application and the satisfaction of various conditions precedent to coverage. These conditions may include insurability, actual acceptance by the company and delivery and receipt of the policy.[1] The purpose of this sales device was to correct the disadvantageous situation that was present due to the necessary interval between the time a policy of insurance is applied for and the time it is issued. A lack of coverage during this interval before issuance of the policy, which may extend for days or weeks, is disadvantageous to the applicant in that he may suffer an illness or accident that will make him uninsurable. It is also disadvantageous to the insurer in that the insurance company runs the risk that the applicant may change his mind and buy from a competitor or may decline insurance altogether, in either event it incurs a net loss for the expenses of investigating and processing the application.[2] The conditional receipt remedies these problems by requiring an initial premium which is usually forfeited if the applicant revokes his desire for the insurance while the company is determining the insurability of the applicant. It also usually provides temporary insurance to the applicant while the company is determining the applicant's insurability and consequent-

ly, any subsequent change in the applicant's condition (i. e., death or his becoming uninsurable) will not result in lack of coverage if the company has determined that he was insurable *at the time of the application*.[3] (emphasis added)

The premium deposit receipt that Grandpre received is similar to that of a conditional receipt as stated above. After stating that payment had been received from Grandpre "as premium deposit for proposed insurance," the frontside of the receipt also contained the following language: "IMPORTANT: This receipt does not provide any insurance until after its conditions are met." (see Appendix A) The terms and conditions on the back of the receipt provided that if (1) the full initial premium is paid, (2) any required physical examination is completed, and (3) the company is satisfied that the applicant is an insurable risk under the company's rules and standards for the policy, the policy would become effective as of the application date, which was defined as "the latest of the date of Part I, the date of Part II, or the date of completion of the last of all medical examinations required, if any." (see Appendix B)

The receipt here in question would be classified as the type generally referred to as the "insurable" type rather than approval type. As stated in *Cliborn v. Lincoln Natl. Ins. Co.*, 332 F.2d 645 (10th Cir. 1964) the "insurable" type is usually interpreted as providing:

That the insurance would be in force if at the date the application is completed, the applicant be in good health, *be a risk acceptable under the company rules on the plan of insurance applied for and at the rate of premium paid*. (emphasis added)

Since the application is not subject to the approval or acceptance by the company as provided in the "approval" type receipt, it is not necessary to discuss the authorities considering the approval type of receipt.

---

1. *Brown v. Equitable Life Ins. Co. of Iowa*, 60 Wis.2d 620, 211 N.W.2d 431 (1973).

2. Keeton, Insurance Law, § 2.3(a) at p. 36.

3. *Brown v. Equitable Life Ins. Co. of Iowa*, supra.

The courts have generally construed conditional receipts with satisfaction provisions similar to the defendant's in one of three ways: (1) The condition of insurability must be met before any contract of insurance exists, i. e., condition precedent;[4] or (2) the condition of insurability, if not met, retroactively destroys any temporary insurance coverage which may have existed, i. e., condition subsequent (trial court's and defendant's position); or (3) temporary insurance coverage exists subject to termination by the company only upon notice to applicant. (plaintiff's position).

In support of appellant's position a number of jurisdictions have held that the conditional receipt gives rise to an interim contract of insurance, said insurance being terminable upon the company's good faith determination that the applicant is uninsurable and notification of the applicant of this decision. These decisions are usually based on the premise that the conditions as set forth in the conditional receipt are ambiguous and uncertain and therefore must be most strongly construed against the insurer, and where provisions are susceptible to different interpretations, the interpretation which will sustain the policy should be adopted. In this light those courts have adopted the interpretation of the premium deposit receipt as providing a temporary contract for life insurance immediately upon execution of the application, payment of the premium and the completion of the medical examination. Consequently, the provision in the receipt that the company be satisfied that the insured be acceptable at the date of the application creates only a right of the insurer to terminate the contract if the company becomes dissatisfied

with the risk before a permanent policy is issued or a loss incurred.[5] Accepting this interpretation, the insurance company would be liable for they did not terminate the policy until after the applicant had died and thus had not given the applicant personal notice of termination.

However, that is not the case in this situation. The trial court found and we agree, that the language within the premium receipt is not ambiguous. This court has held in *Strong v. State Farm Mutual Insurance Co.,* 76 S.D. 367, 78 N.W.2d 828 (1956) that a contract of insurance is to be construed liberally in favor of insured and strictly against the insurer only when the language of the contract is ambiguous and susceptible of more than one interpretation. Thus, the insurance contract's language must be construed according to its plain and ordinary meaning. It does not permit the court to make a forced construction or a new contract for the parties.[6] There is stated on the front of the receipt in boldface letters "IMPORTANT: This receipt does *NOT* provide any insurance until after its conditions are met." (emphasis added). We feel that the plain and ordinary meaning of the words involved in the conditions would alert any ordinary person to understand what had to be completed before the temporary or interim insurance would be effective.[7] Even the fact that the conditions of the receipt were on the back of the form has not persuaded courts to find such terms and receipts ambiguous.[8]

Since we can find no ambiguity in the receipts, we apply a strict contractual

---

4. We will not discuss the condition precedent question any further since as previously mentioned both parties and the trial court have addressed the conditional receipt as a condition subsequent.

5. *Toevs v. Western Farm Bureau Life Ins. Co.,* 1971, 94 Idaho 151, 483 P.2d 682; *Service v. Pyramid Life Ins. Co.,* 1968, 201 Kan. 196, 440 P.2d 944; *Jones v. John Hancock Mutual Life Insurance Co.,* 416 F.2d 829 (6th Cir. 1969); *Metropolitan Life Insurance Co. v. Wood,* 302 F.2d 802 (9th Cir. 1962); *Ransom v. The Penn Mutual Life Ins. Co.,* 1954, 43 Cal.2d 420, 274

P.2d 633; *Gaunt v. John Hancock Mutual Life Ins. Co.,* 160 F.2d 599 (2 Cir. 1947).

6. *Strong v. State Farm Mutual Insurance Co.,* supra; *Thompson v. State Auto Ins. Ass'n,* 70 S.D. 412, 18 N.W.2d 286 (1945).

7. *Gaunt v. John Hancock Mutual Life Ins. Co.,* supra.

8. *Morgan v. State Farm Life Insurance Co.,* 240 Or. 113, 400 P.2d 223 (1965).

construction in holding that the receipt clearly means that a contract of insurance is to be effective as of the date that the applicant signed the application, paid the premium deposit, or completed the physical examination, whichever occurred later, conditioned however upon the subsequent finding by the insurer of the applicant's insurability as of such date.[9] This interpretation means that, if and when the company has made a good faith determination that the condition has not been satisfied and the applicant is uninsurable, this determination would retroactively defeat all previous existing temporary insurance coverage, i. e., insurability is a condition subsequent. We feel that this construction clearly expresses the intention of the parties.[10]

The insurance company is not receiving a premium without assuming any risk. It is assuming the risk that if something unrelated to insurability had happened to Grandpre subsequent to the application date and regardless of whether the company accepted or rejected the policy, the insurance company would be liable if Grandpre had been insurable at the date of application, as defined. The insurance industry is a risk industry, operated on a supposedly sound actuarial basis. The conditions that must be met to attain insurance coverage were reasonable and were very clearly stated in the receipt. We cannot expect the insurers to write their contracts in the language of children's primers, "see the dog run, run dog run" style.

The obvious advantage that the applicant acquired was that if the insurance company made a determination that he was insurable at the date of the application, he would be covered during the interim period in case something would happen to his health.[11]

With respect to the question of insurability at the date of application it is important to notice that the receipt specifically provided:

> . . . shall be satisfied that each person proposed for insurance under the policy applied for was on the Application Date insurable under the Company's rules and standards for the policy in the amount and on the form applied for and for the premium specified in Part I.

This type of clause has usually been interpreted to mean the applicant must meet an objective standard of insurability, and that this standard is the company's own standard for the plan, the amount and the benefits applied for and at the rate applied for.[12] Based on this standard of insurability, Grandpre, at the time of application, was not insurable. Affidavits by the company officers and the stipulation of facts, point No. 8 show that the application was made on the standard basis but, because of Grandpre's ulcer history, defendant had determined that he was not insurable on a standard basis. Counsel for the plaintiff had stipulated to this fact. The company had a right to decline issuance of policy even though applicant may have been eligible for different or rated policy.[13]

█ This is not to say that the insurer's officers could defeat the applicant's right to temporary insurance by arbitrarily refusing

**9.** *Damm v. National Insurance Co.*, N.D., 200 N.W.2d 616 (1972).

**10.** Couch on Insurance, § 14.45, p. 631; *Reynolds v. NW Mutual Life Insurance Co.*, 189 Iowa 76, 176 N.W. 207; *Damm v. National Ins. Co. of America*, supra; *Taylor v. New York Life Ins. Co.*, 324 F.2d 768 (10th Cir. 1963); *American National Bank & Trust Co. of Chicago v. Certain Underwriters of Lloyd's of London*, 444 F.2d 640 (7th Cir. 1971); *Rivota v. Fidelity & Guaranty Life Ins. Co.*, 497 F.2d 1225 (7th Cir. 1974).

**11.** Other advantages that would accrue to the applicant would be: (1) The insurable applicant who dies prior to the completion of the company's evaluation of the application is protected; (2) the policy would sooner become incontestable; (3) the policy would earlier reach maturity with corresponding acceleration of dividends and cash surrender; (4) if the insured's birthday was between "completion" and "approval" the premium would be computed at a lower rate; (5) when the policy covers disability, the coverage dates from "completion." *Rivota v. Fidelity & Guaranty Life Ins. Co.*, supra; *Gaunt v. John Hancock Mutual Life Ins. Co.*, supra.

**12.** *Simpson v. Prudential Ins. Co. of America*, 227 Md. 393, 177 A.2d 417 (1962).

**13.** *Cortez v. Life Ins. Co.*, 408 F.2d 500 (8 Cir. 1969).

to form an opinion of the applicant's insurability until after applicant's death. They must prove at trial that at the commencement of interim coverage they had determined that applicant was an uninsurable risk in the amount and form applied for. (*Damm*, supra) It must be shown that the determination by the officers of the applicant's insurability at the time of his application must have been made in good faith and was not an arbitrary act. If a reasonably prudent and careful officer, acting in good faith, would on available evidence find that applicant was insurable for the type of insurance applied for, that insurance policy would be effective from the application date, thus allowing the insurance proceeds to go to the beneficiary.[14] In examining the record we find that the insurer proceeded expeditiously and in good faith in determining that Grandpre was uninsurable in the amount and form applied for. The ulcer condition did not happen subsequent · to the application date and therefore would have necessitated a change from the policy applied for.

We distinguish this case from *Duerksen v. Brookings Life & Casualty,* 84 S.D. 20, 166 N.W.2d 567 (1969) in which this Court held that the period of effective insurance was from the date the policy is accepted by the company, not the date of application, even though in that case the policy was back dated to the date of application. In the instant case the policy specifically states:

insurance under the terms and conditions of each policy applied for shall become effective *as of the application date* regardless of the occurrence after the application date of death or change of insurability . . .

A literal reading of Grandpre's policy demonstrates that the policy is effective at the application date, whereas, in *Duerksen* there is no mention that there was a relation back clause within the contract. In *Duerksen* the insurance company back dated the policy on their own volition. *Duerksen* can still be good law for policies that do not include within the policy a relation back clause as was found in Grandpre. Also, the insurance policy in *Duerksen* was of the type conditioned upon acceptance *and delivery* which stated that the insurance company would not incur any obligation or would not go into effect *until it was accepted* by the insured. Therefore, a contract of insurance did not arise until the point of acceptance in *Duerksen* by the specific contractual agreement.

We therefore affirm the holding of the trial court.

DUNN, C. J., and WOLLMAN, J., concur.

ZASTROW and PORTER, JJ., dissent.

Appendices to follow.

14. *United Founders Life Insurance v. Carey* (Tex.) 363 S.W.2d 236 (1962); *Occidental Life Ins. Co. v. Bobs LeRoy's Inc.,* 413 F.2d 819 (5 Cir. 1969).

APPENDIX A                    APPENDIX B

Detach only if deposit of the full initial premium for each policy is made at time of completion of Part I.

## PREMIUM DEPOSIT RECEIPT

Received from _Shirley C. Dwyer_ , the following:

(Deposit)

Life insurance premium deposit................$ 43.71

Health insurance premium deposit............$

Total deposit ....................................$ 43.71

as premium deposit for proposed insurance on _Shirley C. Dwyer_
                                                            Life Proposed

for which Part I of an application bearing the same number as this receipt is this date made to Northwestern National Life Insurance Company, Minneapolis, Minnesota.

The terms and conditions on the other side hereof are a part of this receipt.

_Cloquet, Mn._   _3-8-_ , 19 _70_   _E. Harold J. Cooper_
Place and Date          (over)              Agent

**IMPORTANT: This Receipt does not provide any insurance until after its conditions are met.**

No 156327

---

IMPORTANT: This Receipt does not provide any insurance until after its conditions are met.

**THE PAYMENT ACKNOWLEDGED BY THIS RECEIPT IS MADE AND RECEIVED SUBJECT TO THE FOLLOWING CONDITIONS:**

(As used herein, "Application Date" shall mean "the latest of the date of Part I, the date of Part II, or the date of completion of the last of all medical examinations required, if any.")

A. (1) If the amount received by the Company's agent on the date of this receipt is the full initial premium for each policy applied for in Part I; and

(2) If the medical examinations, if any, required by the Company are completed; and

(3) If the Company at its Home Office shall be satisfied that each person proposed for insurance under the policy applied for was on the Application Date insurable under the Company's rules and standards for the policy in the amount and on the form applied for and for the premium specified in Part I;

then, but only after such conditions are met, insurance under the terms and conditions of each policy applied for shall become effective as of the Application Date regardless of the occurrence after the Application Date of death or change of insurability of any person proposed for insurance; provided, however, that the maximum amount of insurance upon the Life Proposed which may take effect under this paragraph A shall be $200,000 of life insurance and $50,000 accidental death benefit reduced by the respective amounts of ordinary life insurance and accidental death benefit (1) in force in the Company on the Application Date on the Life Proposed, and (2) applied for in the Company on the Life Proposed under an outstanding Premium Deposit Receipt bearing a lower number than this Receipt.

B. Except as provided under paragraph A above, no insurance shall take effect, including insurance in excess of the maximum limits as specified in paragraph A above, unless and until a policy or policies is issued and delivered to the Owner and the full initial premium paid, all while there has been no change in the insurability of any person proposed for insurance from the date of this application.

C. If the conditions set forth in paragraph A(1) above are met, but if 45 days after the date of this receipt any of the other conditions in paragraph A above have not been met, the application shall be deemed declined. If the Company declines to issue a policy or issues a policy other than as applied for which is not accepted, the amount paid will be refunded. There shall be no liability on account of this receipt if any check or draft is not honored upon presentation for payment by the Company. No agent is authorized to waive or modify the provisions of this receipt.

ZASTROW, Justice (dissenting).

The majority holds that the premium deposit receipt is of the "insurable" type and not the "approval" type of conditional receipt. However, that interpretation ignores the very language of condition No. 3, i. e.:

"*If the Company at its Home Office shall be satisfied* that each person proposed for insurance under the policy applied for was on the Application Date insurable under the Company's rules and standards for the policy in the amount and on the form applied for and for the premium specified in Part I; *then but only after such conditions are met,* insurance under the terms and conditions of each policy applied for shall become effective as of the Application Date regardless of the occurrence after the Application Date of death or change of insurability of any person proposed for insurance * * *."

It is only too clear that the temporary insurance does not become effective until the company is satisfied with the proposed insured; whereupon, a policy will be issued which relates back to the application date. This is the strict construction view adopted by some jurisdictions. *Brown v. Equitable Life Insurance Company of Iowa,* 1973, 60 Wis.2d 620, 211 N.W.2d 431; *Simpson v. Prudential Insurance Co. of America,* 1962, 227 Md. 393, 177 A.2d 417; *La Barre v. Prudential Ins. Co. of America,* 1936, 284 Ill.App. 653, 2 N.E.2d 354; *Scheinman v. Phoenix Mut. Life Ins. Co. of Hartford, Conn.,* 1969, 7 Cir., 409 F.2d 999; *Cortez v. Life Insurance Company of North America,* 1969, 8 Cir., 408 F.2d 500. The rationale behind these holdings is simply that as a matter of strict contract law the language of the receipt clearly expresses the intention of the parties. Annot., 2 A.L.R.2d 987, 43 Am.Jur.2d, Insurance, §§ 220–225; 44 C.J.S. Insurance § 230a(3).

However, I agree with the Nevada Supreme Court's statements in *Prudential Insurance Company of America v. Lamme,* 1967, 83 Nev. 146, 425 P.2d 346 that:

"[A]n insurance policy is not an ordinary contract. It is a complex instrument, unilaterally prepared, and seldom understood by the assured. The same is equally true of the conditional receipt. The parties are not similarly situated. The company and its representatives are expert in the field; the applicant is not. A court should not be unaware of this reality and subordinate its significance to strict legal doctrine. (citation omitted) Nor should a court be obliged to overlook the obvious advantage to the company in obtaining payment of the premium when the application is made. It is a device to avoid the possibility that the applicant will change his mind and revoke his application, or deal with a rival company." 425 P.2d at 347.

See also *Toevs v. Western Farm Bureau Life Insurance Co.,* 1971, 94 Idaho 151, 483 P.2d 682; *Peterson v. Great American Ins. Co.,* 74 S.D. 334, 52 N.W.2d 479, 481; *Craig v. National Farmers Union Automobile & Cas. Co.,* 76 S.D. 349, 78 N.W.2d 464, 467.

If there was to be no contract of insurance until the company was satisfied as to the applicant's insurability, and a policy issues thereon, it would seem entirely immaterial to the insured whether the contract related back to the date of the application or not. If he lived until the application was approved and a policy issued, it would not matter whether he had been insured during the interim between the date of the application and the date of issuance of the policy. On the other hand, if he died before the application was approved and the policy issued, his beneficiary would derive no benefit from the insurance if a "rejection in good faith" is made by the company. *Service v. Pyramid Life Insurance Company,* 1968, 201 Kan. 196, 440 P.2d 944.

Though the underwriters may be aware that certain advantages [1] exist which could

1. (1) Applicant is protected against subsequent change in physical condition which might otherwise render him unacceptable to the company; (2) The insurable applicant who dies prior to the completion of the company's evaluation of the application is protected; (3) The policy would sooner become incontestable; (4) The policy would earlier reach maturity with corresponding acceleration of dividends and cash surrender; (5) If the insured's birthday was

justify construing the premium deposit receipt in this way, the ordinary applicant would not be aware of those advantages. As Judge Learned Hand stated in *Gaunt v. John Hancock Mut. Life Ins. Co.*, 1947, 2 Cir., 160 F.2d 599:

> "An underwriter might so understand the phrase, when read in its context, but the application was not to be submitted to underwriters; *it was to go to persons utterly unacquainted with the niceties of life insurance, who would read it colloquially. It is the understanding of such persons that counts;* and not one in a hundred would suppose that he would be covered, not 'as of the date of completion of Part B,' as the defendant promised, but only as of the date of approval. Had that been what the defendant meant, certainly it was easy to say so; and had it in addition meant to make the policy retroactive for some purposes, certainly it was easy to say that too. To demand that persons wholly unfamiliar with insurance shall spell all this out in the very teeth of the language used, is unpardonable. It does indeed some violence to the words not to make actual 'approval' always a condition, and to substitute a prospective approval, however inevitable, when the insured has died before approval. *But it does greater violence to make the insurance 'in force' only from the date of 'approval;' for the ordinary applicant who has paid his first premium and has successfully passed his physical examination, would not by the remotest chance understand the clause as leaving him uncovered until the insurer at its leisure approved the risk; he would assume that he was getting immediate coverage for his money.*" 160 F.2d at 601–602; cert. den., 331 U.S. 849, 67 S.Ct. 1736, 91 L.Ed. 1858 (emphasis supplied)

The chief objective of a relation back provision would be to enable the insurance company to collect premiums for a period during which there was in fact no insurance and, consequently, no risk. *Service v. Pyramid Life Insurance Company*, supra.

It would appear that the majority's interpretation of the premium deposit receipt as a condition subsequent is clearly contrary to the plain meaning of the language used in the receipt. At the very least, it certainly indicates that the terms and conditions of the receipt are ambiguous.

In construing the premium deposit receipt, we keep in mind the rules of interpreting insurance contracts that any uncertainty or ambiguity must be most strongly against the insurer,[2] and where provisions are susceptible to different interpretations, the interpretation which will sustain the policy should be adopted.[3] Therefore, I would adopt the interpretation of the premium deposit receipt as providing a temporary contract for life insurance immediately upon execution of the application, payment of the premium and the completion of the medical examination. The provision that the company be satisfied that the insured be acceptable at the date of the application creates only a right of the insurer to terminate the contract if the company becomes dissatisfied with the risk before a permanent policy is issued. *Toevs v. Western Farm Bureau Life Insurance Co.*, supra; *Service v. Pyramid Life Insurance Company*, supra; *Jones v. John Hancock Mutual Life Insurance Company*, 1969, 6 Cir., 416 F.2d 829; *Metropolitan Life Insurance Company v. Wood*, 1962, 9 Cir., 302 F.2d 802; *Ransom v. The Penn Mutual Life In-*

between "completion" and "approval," the premium would be computed at a lower rate; (6) When the policy covers disability, the coverage dates from "completion." *Rivota v. Fidelity & Guaranty Life Insurance Company*, 1974, 7 Cir., 497 F.2d 1225; *Gaunt v. John Hancock Mut. Life Ins. Co.*, 1947, 2 Cir., 160 F.2d 599.

2. See *Dairyland Ins. Co. v. Kluckman*, 1972, 86 S.D. 694, 201 N.W.2d 209; *Presentation Sisters, Inc. v. Mutual Ben. Life Ins. Co.*, 1971, 85

S.D. 678, 189 N.W.2d 452; *Wilson v. Allstate Ins. Co.*, 1971, 85 S.D. 553, 186 N.W.2d 879; *Aetna Ins. Co. v. Labor*, 1970, 85 S.D. 192, 179 N.W.2d 271.

3. *Duerksen v. Brookings International Life & Cas. Co.*, 1969, 84 S.D. 20, 166 N.W.2d 567; *Dakota Block Co. v. Western Casualty & Surety Co.*, 1965, 81 S.D. 213, 132 N.W.2d 826; *Dairyland Ins. Co. v. Kluckman*, supra.

surance Company, 1954, 43 Cal.2d 420, 274 P.2d 633; *Gaunt v. John Hancock Mut. Life Ins. Co.,* supra; *Albers v. Security Mutual Life Ins. Co.,* 1918, 41 S.D. 270, 170 N.W. 159.

As Judge Hand has stated, the understanding of an ordinary person is the standard which must be used in construing the contract, *Gaunt v. John Hancock Mut. Life Ins. Co.,* supra; and such a person upon reading the application would believe that he would secure the benefit of immediate coverage by paying the premium and completing the medical examination. Because of the obvious advantages to the insurer in obtaining payment of the premium when the application is made, it would be unconscionable to permit the company, after using language to induce payment of the premium at that time, to escape the obligation which an ordinary applicant would reasonably believe had been undertaken by the insurer. The language in the receipt is ambiguous, and that ambiguity must be resolved against the defendant-insurer. *Duncan v. John Hancock Mut. Life Ins. Co.,* 137 Ohio St. 441, 31 N.E.2d 88; *Gaunt v. John Hancock Mut. Life Ins. Co.,* supra.

For these reasons I would hold that the premium deposit receipt used by the defendant created a temporary contract of insurance subject to a condition—rejection of Stanley Grandpre's application by the defendant or by the failure of the defendant to act upon the application within forty-five days. It would not have to be decided whether rejection would have been effective without notice to the applicant since rejection did not occur prior to his death, but, in fact, happened one day after his death. The temporary insurance contract upon Grandpre's life was still in effect at the time of his death and the insurance company is liable. Patterson, Essentials of Insurance Law, 2d ed., p. 100 (1957); citing *Gaunt v. John Hancock Mut. Life Ins. Co.,* supra; and *Reck v. Prudential Ins. Co. of America,* 1936, 116 N.J.L. 444, 184 A. 777; *Allen v. Metropolitan Life Ins. Co.,* 1965, 44 N.J. 294, 208 A.2d 638; *Ransom v. The Penn Mutual Life Insurance Company,* supra; *Prudential Insurance Company of America v. Lamme,* supra; *Toevs v. Western Farm Bureau Life Insurance Co.,* supra.

PORTER, Justice (dissenting).

I would hold that defendant insurer was under a duty to explicitly inform Grandpre that he had no life insurance coverage until such time in the future as insurer, at its home office, might approve issuance of the policy applied for. "While insurance policies and binders are contractual in nature, they are not ordinary contracts but are 'contracts of adhesion' between parties not equally situated [citations omitted]." *Allen v. Metropolitan Life Ins. Co.,* 44 N.J. 294, 305, 208 A.2d 638, 644 (1965).

When the insurer's representatives solicited Grandpre they could readily have taken his application without any advance premium. Instead, for reasons important to the company and to its financial advantage, they sought and obtained from Grandpre the sum of $43.71 and in return gave him a premium deposit receipt. Appendixes A and B. Unless otherwise informed by insurer, a reasonable man in the position of Grandpre could understand that collection of this initial premium afforded him interim or temporary coverage until the insurer at some time in the future issued or declined to issue the policy. The principle of honoring reasonable expectations properly applies under these circumstances. Keeton, Insurance Law § 6.3(a) (1971). "It is important to note, however, that the principle of honoring reasonable expectations does not deny the insurer the opportunity to make an explicit qualification effective by calling it to the attention of a policyholder at the time of contracting, thereby negating surprise to him." *Keeton,* supra, at 352.

If the premium were not collected with the application, Grandpre could not reasonably understand that he was afforded interim coverage. Since it was collected, the insurer was left with the obligation to express to Grandpre the fact of his non-coverage in a manner it could reasonably expect a layman to understand. The medium chosen by insurer—its premium deposit re-

ceipt—would not be readily understood by most laymen. (Reference to the reverse side of the receipt might cause many lawyers to consider the preceding sentence an understatement.) The front side, Appendix A, is in larger type than the back side, Appendix B. The reasonable layman, observing on the front side, "IMPORTANT: This Receipt does not provide any insurance until after its conditions are met," upon turning to the reverse side would likely be unable to gain any understanding, much less a clear or explicit understanding, from the fine print conditions there. Moreover, reference on the reverse side to "Part I" and "Part II" in effect required Grandpre to consult two additional documents not placed in his possession, the completed application (Part I) and the subsequently completed doctor report of examination (Part II).

The insurer prepared all the forms used and unilaterally dictated all steps of the transaction. If under the procedure chosen by insurer, the objectively reasonable expectation of the lay applicant arising from that procedure is not to be met, the insurer should be chargeable. Thus, under the circumstances here, I would hold that insurer, as a matter of law, afforded coverage from the time of collection of the premium and delivery of the premium deposit receipt, Appendixes A and B.

I would also avoid the serious impracticalities which may well result from allowing retroactive coverage where the insurer's home office decision may not infrequently be made with knowledge that an applicant has died. *See Allen v. Metropolitan Life Ins. Co.,* 44 N.J. 294, 306, 208 A.2d 638, 645 (1965), and cases cited therein.

I concur in the dissenting opinion of Justice Zastrow as a further basis for reversal.